PARIENTE, J.,
concurring.
I concur with the majority that juvenile offenders like Kelsey, who were previously resentenced after the United States Supreme Court decided Graham v. Florida, 560 U.S. 48 [180 S.Ct. 2011, 176 L.Ed.2d 825] (2010), but before the Legislature enacted chapter 2014-220, Laws of Florida, are entitled to resentencing under this sentencing scheme. Majority op. at 14. Re-sentencing under this new juvenile sentencing scheme includes, in most instances, the benefit of judicial review of the sentence as set forth in section 921.1402(2), Florida Statutes (2014). See majority op. at 10-11.
I write to emphasize that, in this case, even though our precedent in Dunbar v. State, 89 So.3d 901 (Fla. 2012), does not preclude the State from seeking a life sentence on remand because Kelsey’s previously imposed sentence was illegal, the individualized sentencing consideration required by Graham and our juvenile sentencing precedent will likely preclude such a sentence. Indeed, as I explain below, I would conclude that Kelsey is precluded from being resentenced to a term exceeding his current forty-five-year sentence when the sentencing court takes into account all of the sentencing factors set forth in section 921.1401(2).
As we explained in Landrum v. State, chapter 2014-220 sets forth the individualized sentencing considerations that a sentencing court must consider “when determining if a juvenile offender should be sentenced to life imprisonment.” 192 So.3d 459, 466 (Fla. 2016). These considerations have since been codified in section 921.1401(2), Florida Statutes (2014), and include the following sentencing factors:
(a) The nature and circumstances of the offense committed by the defendant.
(b) The effect of the crime on the victim’s family and on the community.
(c) The defendant’s age, maturity, intellectual capacity, and mental and emotional health at the time of the offense.
(d) The defendant’s background, including his or her family, home, and community environment.
(e) The effect, if any, of immaturity, impetuosity, or failure to appreciate risks and consequences on the defendant’s participation in the offense.
(f) The extent of the defendant’s participation in the offense.
(g) The effect, if any, of familial pressure or peer pressure on the defendant’s actions.
(h) The nature and extent of the defendant’s prior criminal history.
(i) The effect, if any, of characteristics attributable to the defendant’s youth on the defendant’s judgment.
(j) The possibility of rehabilitating the defendant.
' The record in this case demonstrates that, while the sentencing court did not consider all of the above factors, the sentencing court was aware that the Legislature was at the time considering legislation later enacted as chapter 2014-220, Laws of Florida. Indeed, the sentencing court considered some of the individualized sentencing considerations since codified in section 921.1401(1) when determining whether to again sentence Kelsey to life in prison or to some lesser term. As the court explained:
We have to make a decision based on what we know about a person’s history, taking into account their psychological condition, their mental health, their age, you know, disabilities, severity of the crime, and all of the factors that [the *13 psychologist] went over and defense counsel has adequately covered.
Further, the sentencing court heard testimony from a psychologist who had evaluated Kelsey, and whose testimony underscored “the special status of juvenile offenders for purposes of criminal punishment.” Henry v. State, 175 So.3d 675, 677 (Fla. 2015). As the psychologist explained:
So, you have a 15 year old with a 80 IQ, borderline intellectual functioning, maybe even a lower achievement at that age, maybe, I don’t know. And then you have an adolescent, young brain develop[ment], where they have low decision making ability, frontal lobe not being developed, executive functioning not being developed, and that’s compounded by an IQ in the borderline range.
Secondary, you have a kid whose, you know, in a marginal lifestyle, some trouble, maybe some special education, and he’s not functioning very high in terms of cognitive ability and he’s hanging out with what we call deviant peers. And so—well, I don’t that, I didn’t see him when he was 15, I’m making some hypothesis from evaluating juveniles over the years, and often juveniles with this level of functioning start doing bad things, start doing delinquent type things because they’re faced with the choice of being called lots of names, retarded, dumb, dummy, and they don’t want to be called those things and the way to get around that is to start acting out, and so they can be called bad, and they get identified as bad, and that’s part of their personality, and it’s the way they get accepted, and knowledge of deviant peer groups, but they want to fight against being called dumb or any of those derogatory words that teenage boys are apt to use. And so, they overcompensate and they get tough and street tough and start acting tough, and they start looking like the delinquent kid, and it’s really because of the way they are in their life, without enough positive adult mentoring peer, without enough appropriate prosocial peer groups. So, it has, sorry to use this word, it has a waterfall effect, you know.
These statements demonstrate that the sentencing court was cognizant of the United States Supreme Court’s command that the “status of juvenile offenders warrants different considerations by the states whenever such offenders face criminal punishments as if they are adults.” Id. at 678. Therefore, even though chapter 2014-220 “contemplates the possibility of a life sentence for a juvenile nonhomicide offender,” majority op. at 10, I would conclude that such a possibility is slim. This is especially so in this case, where the sentencing court previously tried to comply with Graham during resentencing, expressly considered some of the sentencing factors now codified in section 921.141, and sentenced the juvenile offender to concurrent sentences of forty-five years. Put simply, upon resentencing, the sentencing court must consider whether Kelsey is the “rare juvenile offender whose crime reflects irreparable corruption,” and thereby warrants a life sentence. Horsley, 160 So.3d at 397 (citing Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012)). In my view, imposing a lengthier sentence in this nonhomicide case upon consideration of additional individualized sentencing factors wbuld violate the basic “precept of justice that punishment for crime should be graduated and proportioned' to [the] offense.” Landrum, 192 So.3d at 460-61 (quoting Graham, 560 U.S. at 59, 130 S.Ct. 2011) (noting that upholding a juvenile offender’s life without parole sentence for second-degree murder “would violate this precept, as a juvenile convicted of the lesser offense of second-degree murder would receive a harsher sentence than *14 a juvenile convicted of first-degree murder”).
LABARGA, C.J., and PERRY, J„ concur.